## CIRCUIT COURT OF CLARKE COUNTY

Louis Scott Hudson

v.

Director of the
Department of Corrections

May 16, 2005

Case No. (Law) 04-4838

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on May 12, 2005, for consideration of the Petition for Writ of Habeas Corpus challenging the validity of the Petitioner's conviction based upon ineffective assistance of counsel and procedural defects in the appeal of his case arising from counsel's failure to assign cross-error on the Commonwealth's appeal from the Court of Appeals to the Supreme Court. After careful consideration of the record, the Court has made the following decision to dismiss the petition.

## I. Statement of Material Facts

The following facts are established by the record in this case.

### A. Material Proceedings

The petitioner is in custody pursuant to final judgment of this Court entered on March 27, 2001. A jury tried Hudson on January 11-13, 2001, on charges of murder and use of a firearm in the commission of murder. Following the defense motion to strike the Commonwealth's evidence, the Court struck the first-degree murder count and the charge proceeded as second-degree murder. The Court instructed the jury on second-degree murder and voluntary manslaughter. The jury convicted Hudson of second-degree murder and use of a firearm in the commission of murder and fixed his punishment at seventeen years in prison for the murder and three years for the firearm charge. The Court sentenced Hudson in accordance with the jury's verdict, but suspended five years of the murder sentence. (Case Nos. 00-4371 through 00-4372.) (Exhibit 1, copy of final order.) The petitioner was represented in this Court by Timothy S. Coyne, Esquire.

The petitioner appealed his convictions to the Court of Appeals of Virginia. The Court of Appeals granted Hudson's petition for appeal. (Record No. 0917-01-4.) By an unpublished opinion dated July 16, 2002, that Court reversed and dismissed Hudson's convictions, holding that the evidence was insufficient to sustain the convictions, so it did not address the evidentiary issues it also had granted. The Court of Appeals noted, "Because we find the evidence insufficient to sustain Hudson's second-degree murder conviction, we do not address these additional issues." (Exhibit 2, at p. 2, n. 1.)

The Commonwealth filed a petition for appeal in the Supreme Court of Virginia assigning as error (1) that the Court of Appeals failed to apply the appropriate appellate standard of review and instead held that the evidence was insufficient to prove Hudson committed murder beyond a reasonable doubt, and (2) that the Court of Appeals erred by holding that the Commonwealth failed to exclude the reasonable hypothesis of innocence that the victim shot herself accidentally or as an act of suicide.

The Supreme Court granted the appeal and in a unanimous opinion issued April 17, 2003, reversed the judgment of the Court of Appeals and reinstated the judgment of the Trial Court. *Commonwealth v. Hudson*, 265 Va. 505, 578 S.E.2d 781 (2003).

Hudson filed a petition for rehearing in the Supreme Court of Virginia limited to the issue that the Supreme Court erred in failing to remand the case

to the Court of Appeals for consideration of the issues that the Court of Appeals had granted but not decided in its opinion. (Exhibit 4.) The Court denied the petition for rehearing. (Exhibit 5.)

Hudson by counsel subsequently filed a petition for certiorari to the United State Supreme Court, alleging that (1) the evidence was insufficient to sustain the convictions and that (2) the Supreme Court of Virginia erred in failing to remand the case to the Court of Appeals of Virginia for determination of the three issues that it had accepted for review but not addressed. By order of October 20, 2003, the Supreme Court of the United States denied the petition for certiorari.

In his habeas petition, Hudson raises the following two claims.

### 1. Ineffective Assistance of Counsel

The petitioner was denied his right to appeal and his right to effective assistance of counsel on appeal. Due to attorney error and through no fault of his own, the petitioner was denied his constitutional right to have all of his appellate issues, save one, decided by the Court of Appeals of Virginia and the Supreme Court of Virginia. Thus, he is entitled to a delayed appeal to the Court of Appeals.

### 2. Due Process/Fundamental Fairness Violation

The petitioner was denied his due process rights and his right to fundamental fairness under the United States and Virginia Constitutions when he was denied his constitutional right to have all of his appellate issues, save one, decided by the Court of Appeals of Virginia and the Supreme Court of Virginia.

### B. Facts Upon Which the Conviction is Based

The petitioner lived with Mary Donovan for several years prior to their marriage in July 1999. (Tr. 555, 1054.)[1] He was unemployed during this entire period. (Tr. 559.) Donovan received an allowance from her trust fund. (Tr. 577.) According to Donovan's doctor, she had a mental age of about twelve years old. (Tr. 1085.)

---

[1] "Tr." refers to the trial transcript.

Donovan had severe chronic pain and took prescription medication for her condition. (Tr. 1085-86.) At the time of her death, Donovan had an infection in her right elbow which caused her pain and which made movement of her right arm very difficult. (Tr. 1082.) She had difficulty bending it, lifting, or holding anything. (Tr. 1082.) According to Donovan's brother David, Donovan did everything she could to avoid pain. (Tr. 573.) Although Hudson owned guns, Donovan did not like guns and did not like to handle them. (Tr. 560.)

On the morning of September 20, 1999, Donovan went fox hunting. (Tr. 497, 499, 520.) That afternoon, she attended a funeral service for her father, who had passed away after a long illness. (Tr. 554.) A reception was held after the service at which both Donovan and the petitioner drank alcohol. (Tr. 567.) Donovan wore a new dress to the events and had received a ring, which was a family heirloom. (Tr. 554.) She was pleased to have received the piece of jewelry and appeared in good spirits. (Tr. 499, 578.)

Following the reception, Donovan and Hudson were alone at their home. Donovan telephoned long-time friend Wes Thompson to ask if he had heard about her father's death. (Tr. 603.) During the phone call, which Thompson estimated occurred around 7:45 p.m., Hudson spoke into the phone in a nasty tone, calling Thompson a "son of a bitch mother fucker," and asking why Thompson was talking to his wife. (Tr. 603-05, 611.) Thompson hung up the phone. (Tr. 604.)

Hudson thereafter telephoned his mother and said that Donovan had shot herself. (Tr. 694.) He did not call 911 to seek medical help or notify the police. (Tr. 1026.) Hudson's parents went to his house, which was only a few miles away. They saw Donovan's body, but they did not touch it. (Tr. 696, 1065.) Hudson was not there, and his father called the police at 7:52 p.m. to report the shooting. (Tr. 631, 696, 1065.)

The officers arrived at Donovan's home around 8:00 p.m. and discovered that it was in violent disarray and that Hudson was not there. (Tr. 646, 662.) There was broken glass on the kitchen floor, near which lay a military shovel. (Tr. 646, 662.) Deputy Jones saw Donovan's body lying on the living room couch. A .22 caliber firearm was awkwardly positioned in her right hand. The gun was lying in the palm of the hand, essentially facing backwards. (Tr. 645.) There was a large bloody hand print on the back cushion of the couch. (Tr. 645, 676.) However, Donovan did not appear to have blood on her hands. (Tr. 648, 1004.)

It was raining hard that night. (Tr. 1068, 1222.) As Officer Crosson was leaving the defendant's house, he noticed a garden hose outside with water running from it "full blast." (Tr. 1068.)

At 9:17 p.m., the police received a call that Hudson was at his parents' home. (Tr. 631.) Hudson's brother, Steven Hudson, saw Hudson in the driveway of their parents' home and helped him inside to try to "sober him up." (Tr. 1172.)

Hudson's father removed a .270 caliber rifle from Hudson's car and put it in the house. (Tr. 1164.) The gun was not in a case. (Tr. 1168.) Hudson's father did not advise law enforcement that he had removed the weapon. (Tr. 1168-69.) Hudson's father did not see blood on the defendant. (Tr. 1169.)

When officers arrived at the house, they saw Hudson seated in his parents' living room, holding a cup of coffee. He was extremely intoxicated. (Tr. 652.) Hudson's father told the officers that he did not want Hudson in his home. (Tr. 652.) The police arrested Hudson for being drunk in public.

Hudson was taken to the sheriff's department. During a pat down search at the jail, Sergeant Elland discovered a .22 caliber bullet in Hudson's coat pocket. (Tr. 634) A gunshot residue test was administered and Deputy Roper obtained a search warrant for Hudson's clothes. (Tr. 1/9/01 at 121, 137-38.) The next morning, about 6:30 a.m., Roper saw Hudson at the jail, and advised him of the Miranda warnings. Hudson then gave a statement. (Tr. 1024.)

Hudson stated that Donovan was unhappy because she thought that she deserved more from her father's estate. (Tr. 1025.) According to Hudson, Donovan picked up the gun and began playing with it. (Tr. 1025.) Hudson said that he told her not to do so. (Tr. 1025.) He said he heard a shot while he was in a nearby bathroom. (Tr. 1025.) He returned and saw Donovan "slumping over" on the couch. He said he left the house and went to his mother's home. (Tr. 1026.)

Hudson stated that he "never got close to" Donovan's body. (Tr. 1026.) Hudson did not know why he did not call 911, and did not remember calling anyone after the shooting. (Tr. 1026-27.) When asked to explain the .22 caliber bullet found in his pocket, Hudson said that he must have picked it up with loose change from his dresser. (Tr. 1027.)

Investigator Stan Gregg of the Virginia State Police interviewed Hudson in the presence of his attorney on November 18, 1999. (Tr. 1053-54.) Hudson said in that statement that, on September 20, he and Donovan were drinking at their home and Donovan was upset because the trust would not let her purchase a truck. (Tr. 1058.) He said that Donovan pulled out a gun, began playing with it, and said she was going to shoot herself. (Tr. 1059.)

Hudson said that he went into the bathroom and while there heard a shot. (Tr. 1059.) When he came out of the bathroom, he saw a "little bit" of blood around Donovan's eyes. (Tr. 1059.) He repeatedly denied going near her body. (Tr. 1059.)

324

Hudson also denied handling any firearm that night. (Tr. 1060.) He said he last touched a firearm two nights prior to Donovan's death. (Tr. 1061.) He could not account for his whereabouts between the time of the shooting and the time he arrived at his parents' house, a period of more than an hour. (Tr. 1060-61.) According to Hudson, neither he nor Donovan made or received any telephone calls that night. (Tr. 1061.)

At trial, the medical examiner testified that Donovan had suffered a "contact range" wound to the head and that the bullet traveled into her head at the left ear and then went into her brain. (Tr. 830-32.) The medical examiner explained that such a wound would cause immediate unconsciousness, and death would follow within minutes. (Tr. 834.) There would have been no voluntary movement by the victim after the gunshot. (Tr. 841.) The doctor also testified that blood would "pour" from the ear wound and would flow quickly after the shot. (Tr. 833-34.)

A firearm expert opined that it was necessary to cock the hammer back before firing the weapon. (Tr. 850.) An expert in gunshot residue testified that both of the defendant's hands showed primer residue. (Tr. 892, 896.) Donovan had residue on her right hand. (App. 559.)[2]

An expert in blood splatters identified bloody contact transfer stains on the couch cushion, the left front thigh of Donovan's jeans, and on Donovan's right forearm. (Tr. 972-73.) The expert testified that the contact transfers came from heavily bloody hands, but not the victim's, because no blood was visible on Donovan's hands. (Tr. 1004.) The expert also testified about blood found beneath an open telephone book on which the victim's hand was propped. The expert opined that a majority of the accumulated blood stain had been "covered" by an open telephone book. (Tr. 979.) She stated that the "blood would have had to be placed there first and then the telephone book on top of that." (Tr. 979.)

Forensic scientist Carol Palmer testified that a spot of blood on Hudson's shirtsleeve matched the victim's blood. (Tr. 920-21.) DNA testing showed that the possibility that the blood came from anyone other than Donovan was one in 51 million. (Tr. 921.)

---

[2] The residue on Hudson's hands contained three elements, barium, lead, and antimony. Residue on Donovan's hands contained only lead and barium. (Tr. 892-900.)

## II. Conclusions of Law

### A. Hearing

The allegations of illegality can be fully determined on the basis of the record; therefore, no plenary hearing is necessary in this case. Va. Code § 8.01-654(B)(4); *See also Friedline v. Commonwealth*, 265 Va. at 277, 576 S.E.2d at 493-94, and *Arey v. Peyton*, 209 Va. 370, 164 S.E.2d 691 (1968). Petitioner's counsel stated his reasons for not assigning cross-error in his Petition for Rehearing filed in the Supreme Court.

### B. Standard of Ineffective Assistance of Counsel

To prevail on his ineffective assistance of counsel claim, the petitioner has the burden to show both that his attorney's performance was deficient and that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Unless [the petitioner] establishes both prongs of the two-part test, his claims of ineffective assistance of counsel will fail." *Jerman v. Director, Department of Corrections*, 267 Va. 432, 438, 593 S.E.2d 255, 258 (2004). "A defendant is constitutionally entitled to effective assistance of counsel on direct appeal, and the standards governing effectiveness at trial are equally applicable to representation on direct appeal." *Tucker v. Catoe*, 221 F.3d 600, 613 (4th Cir. 2000) (citation omitted). *See Smith v. Murray*, 477 U.S. 527, 535-36 (1986).

The first prong of the Strickland test, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In *Bell v. Cone*, 535 U.S. 685, 702 (2002), the Supreme Court held:

> We cautioned in *Strickland* that a court must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.

See *Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000) (reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis"). "The Sixth Amendment's guarantee of assistance of counsel requires that counsel exercise

such care and skill as a reasonably competent attorney would exercise for similar services under the circumstances." *Frye v. Commonwealth*, 231 Va. 370, 400, 345 S.E.2d 267, 287 (1986).

The prejudice requirement of the Strickland test requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id*. An ineffective counsel claim may be disposed of on either prong because deficient performance and prejudice are "separate and distinct elements." *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). *See Strickland*, 466 U.S. at 697; *Sheikh v. Buckingham Correctional Center*, 264 Va. 558, 566-67, 570 S.E.2d 785, 790 (2002). A reviewing court need not determine "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

### C. Failure to Anticipate an Adverse Ruling by the Supreme Court Is Not Ineffective Assistance of Counsel

The petitioner alleges that his counsel was ineffective in prosecuting his appeal because counsel failed to assign cross-error in the Supreme Court of Virginia to the Court of Appeals' failure to address the evidentiary issues on which it has granted his appeal but which were extraneous to the Court of Appeals' decision reversing his conviction. The petitioner contends that he is entitled to a delayed appeal in the Court of Appeals of Virginia so that it can determine the issues accepted for review in that Court, but never reached by the Court of Appeals in its decision.

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Counsel was not ineffective in failing to assign cross-error to the Court of Appeals' failure to address the evidentiary issues it had granted. A *sine qua non* for an appeal is an adverse decision, so it was reasonable for petitioner's counsel to have concluded that it was not necessary to bring the undecided assignments of error before the Supreme Court because those issues had not been decided adversely to him by the Court of Appeals. It was very logical to assume that, if the Supreme Court reversed the Court of Appeals, that it would remand the case to the Court of Appeals for consideration of the unaddressed

points. While Rule 5:18 of the Rules of the Virginia Supreme Court provides that the appellee may assign cross-error in a brief in opposition, there was no cross-error to assign in this case because the Court of Appeals never rendered any decision on the three issues which it did not consider.

After its decision in this case, the Supreme Court of Virginia expressly ruled in *Horner v. Department of Mental Health*, 268 Va. 187, 194, 597 S.E.2d 202, 206 (2004), that, in order to preserve for review an issue on which the Court of Appeals did not rule favorably to a party, that party must assign cross-error to the Court of Appeals' failure to rule. "The Court of Appeals did not rule in favor to the Department on the issue of the circuit court's lack of jurisdiction. In order to preserve that issue for our review, an assignment of cross-error citing the Court of Appeals failure to so rule was necessary." *Id.* at 4. *See also Riner v. Commonwealth*, 268 Va. 296, 325, 601 S.E.2d 555, 572 (2004).[3] *Horner* at 194 cites a footnote in *Wells v. Shoosmith*, 245 Va. 386, 388, n. 1, 428 S.E.2d 909, for the proposition that "an assignment of cross-error citing the Court of Appeals' failure to so rule was necessary [to preserve the point for argument before the Supreme Court]." Although *Wells* involved an appeal from the trial court not an appeal from the Court of Appeals, the Supreme Court apparently saw no difference between a case appealed from the trial court in which alleged errors are properly placed before the appellate courts for review and the failure of the Court of Appeals to rule on points which are not necessary for their decision. In this case, the error was properly preserved for appeal to the Court of Appeals but simply not addressed because the Court of Appeals decided that it was not necessary to its decision.

In the years before this case, the Supreme Court of Virginia appears to have applied a different procedural rule in similar cases. In *Michael Dotson v. Commonwealth*, 00 Vap UNP 1541993 (2000), Dotson appealed his conviction for felony child abuse to the Court of Appeals of Virginia, which granted the appeal on the issue of sufficiency of the evidence and on other evidentiary issues. The Court of Appeals reversed and dismissed the conviction based on its finding that the evidence was insufficient. The Court did not address some of the other issues that it had granted. The Court stated in the opinion issued July 5, 2000, "Because we hold that the evidence was insufficient to support the conviction, we do not address the remaining issues." (Exhibit 8, copy of Court of Appeals *Dotson* opinion at p. 10.) The

---

[3] In *Riner*, the Court included the following parenthetical following a reference to *Horner*: "failure to assign cross-error on an issue the Court of Appeals did not address waives further appellate review of the issue."

Commonwealth appealed the decision of the Court of Appeals to the Supreme Court of Virginia. Dotson did not assign cross-error to the Court of Appeals' failure to address other issues it had granted. (Exhibit 9, copy of brief in opposition.) The Supreme Court granted the Commonwealth's appeal. (Record No. 001898.) In its unpublished opinion of June 8, 2001, reversing the decision of the Court of Appeals, the Supreme Court of Virginia noted that *"the Court of Appeals failed to resolve certain questions concerning the admissibility of evidence. In this case, in order to determine the sufficiency of the evidence, the Court of Appeals must first determine what evidence is subject to their consideration. Accordingly, we reverse and vacate the judgment of the Court of Appeals of Virginia and remand to the Court of Appeals of Virginia for determination of evidentiary questions not decided, and for disposition of the case utilizing the proper standard of appellate review."* (Exhibit 10, copy of unpublished *Dotson* opinion of Supreme Court) (Emphasis added.)

Similarly, in *Megel v. Commonwealth*, 262 Va. 531, 551 S.E.2d 638 (2001), the Supreme Court of Virginia remanded a matter to the Court of Appeals for its determination of an issue. A panel of the Court of Appeals of Virginia had affirmed Megel's firearm conviction, and that Court en banc had also affirmed the judgment. The Court of Appeals ruled that Megel's participation in a home electronic incarceration program was analogous to serving a sentence and thus his home was the functional equivalent of a jail or prison cell, resulting in a loss of Fourth Amendment protection. Megel appealed the decision to the Supreme Court of Virginia. The Supreme Court noted in its opinion that the Commonwealth had argued that "even if Megel was entitled to the protection of the Fourth Amendment, the record supports the trial court's alternative holding that Megel voluntarily consented to the search." *Megel*, 262 Va. at 537, 551 S.E.2d at 642. The Court continued, "The Court of Appeals, however, declined to address this issue in light of its holding that Megel had no reasonable expectation of privacy. . . . Although we question whether Megel raised this issue before the Court of Appeals, we will leave that determination to the Court of Appeals." *Id.* (citation omitted). The Supreme Court concluded:

> *Accordingly, the judgment of the Court of Appeals will be reversed and, because the Court declined to consider the issue of consent and the issue is not before us as an assignment of error, the case will be remanded to the Court of Appeals for consideration thereof.*

Id. (emphasis added).

Effective assistance of counsel is not perfect or errorless performance, but is "professionally reasonable performance." *Poyner v. Murray*, 964 F.2d 1404, 1423 (4th Cir. 1992). Moreover, as *Strickland* instructs, the determination of the reasonableness of counsel's actions must be judged "as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. At least at the time of the Commonwealth's appeal in *Hudson*, it was not reasonable to conclude that the Supreme Court would not remand unresolved issues to the Court of Appeals. Hudson has failed to demonstrate the performance prong of the *Strickland* test.

Courts are creatures of constraint; consequently, their prerogative to act depends upon the jurisdiction which they been granted by the Constitution, by the legislature, and by judicial pronouncements in decisions or rules, like the Rules of Court. The only Rule applicable to this case is Rule 5:18(b), which provides that "cross-error not then assigned will be noticed by this Court." Since courts are creatures of constraint, they decide only those questions presented to them which are necessary to resolve the issue which they are presented. For example, there may be ten assignments of error, but if only one assignment of error is case dispositive in the court's view, as was the view of the Court of Appeals in this case, then only that point of error is or should be decided. The plethora of other assignments of error, even if valid, are superfluous to the decision, so in the interests of judicial economy and in furtherance of the policy of judicial restraint, once a dispositive point is decided, if that decision then merits reversal and the entry of final judgment, the other assignments of error are not addressed. Since the other assignments of error were not considered by the Court of Appeals, there was no decision of the Court of Appeals on the undecided issues to which to assign cross-error by the Defendant, or at least that is how this case would have appeared to counsel and to the Supreme Court in *Dotson v. Commonwealth*, 00 VAP UNP 1541993 (2000), and *Megel v. Commonwealth*, 262 Va. 531, 551 S.E.2d 638 (2001), where the Supreme Court, after reversing the Court of Appeals, remanded the case to the Court of Appeals to consider the appeal points which it had not addressed in its earlier decision.

The law is always in a state of evolution towards perfection. Between July 1, 1997, when the Commonwealth was given its right of appeal and June 10, 2004, when *Horner v. Department of Mental Health, supra*, was decided, the rule governing the assignment of cross-error in appeals to the Supreme Court to issues not decided by the Court of Appeals was in a state of flux. Apparently, in this case, the Supreme Court decided to change or deviate from its prior policy, so it declined to remand the case to the Court of Appeals for further consideration as it had done in other recent, similar cases. This issue

was expressly presented to the Supreme Court in the Petition for a Rehearing, and the Supreme Court could have exercised its discretion to remand this case to the Court of Appeals, and it declined to do so. Counsel could not reasonably have anticipated this unannounced procedural shift by the Supreme Court, and counsel is only required to perform to a professionally reasonable standard; they are not required to be either prescient or perfect. Therefore, the claim of ineffective assistance of counsel is denied.

Since this Court has decided that there was no ineffective assistance of counsel, as a technical matter for the reasons stated above, as a matter of judicial restraint, it need not address the other assignments of error, but it will, since this case is sure to be appealed, and there are alternative grounds for this court's decision.

### D. The Assignments of Error Not Considered by the Court of Appeals

The Petitioner has failed to demonstrate that, but for counsel's alleged error, there is a reasonable probability of a different outcome on the appeal. The three issues of which the Court of Appeals granted review, but did not decide were:

1. Did the trial court properly deny Hudson's motion to suppress evidence obtained following his arrest?

2. When the Commonwealth disclosed a DNA report outside of the statutory time requirement, did the trial court properly exercise its discretion in offering Hudson a continuance and in ruling that the facts did not warrant exclusion of the evidence?

3. Did the trial court properly refuse Hudson's proffered instruction regarding suicide and accident?

A decision on any or all of the three issues would not have resulted in a reversal and remand for new trial.

### 1. Denial of the Motion to Suppress

Hudson argues that the trial court erred in denying his motion to suppress. He claimed that the officers lacked probable cause to arrest him for being drunk in public because he was inside his parents' home when he was arrested; consequently, any evidence seized as a result of the arrest should have been suppressed, including the gunshot residue test results, the clothing seized from him, and statements given by him. However, the trial court did not

err in denying the motion to suppress. The trial court held a hearing on the motion to suppress.[4] When an appellate court reviews a trial judge's denial of a motion to suppress, the court considers the "evidence adduced at both the trial and suppression hearing." *Greene v. Commonwealth*, 17 Va. App. 606, 608, 440 S.E.2d 138, 139 (1994). *See DePriest v. Commonwealth*, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987). The burden is on the defendant to show that the trial court's denial of a motion to suppress, "when the evidence is considered most favorably to the Commonwealth, constituted reversible error." *McGee v. Commonwealth*, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (quoting *Fore v. Commonwealth*, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

"Probable cause exists when the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *Jones v. Commonwealth*, 18 Va. App. 229, 231, 443 S.E.2d 189, 190 (1994) (citation omitted). The probable cause standard is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' 'Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules'." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted).

When the officers arrived at Hudson's parents' home, at his parents' request, they knew that Hudson's father had called dispatch and relayed Hudson's report that Donovan had shot herself in the head. (Tr. 1/9/01 at 82.) For Hudson to have made that report to his father, it was reasonable to infer that he had been present at the home where the shooting occurred. The police responded to Hudson's home around 8:00 p.m. (Tr. 1/9/01 at 66.) Hudson was not there. At 9:17 p.m., Hudson's father called the police and reported that Hudson's location was at the father's home. (Tr. 1/9/01 at 76.) Hudson's father wanted his son removed from his home. (Tr. 1/9/01 at 79, 100, 126, 134; Tr. 652.) The parents' home was a few miles away from Hudson's home. (Tr. 1065.) Clearly, Hudson had traveled from his own home or somewhere to his parents' home. During that journey, he would have been in public. When

---

[4] The Court admitted evidence that the defendant had pleaded guilty in the district court to the charge of being drunk in public. (Tr. 1/9/01 at 92-93.) The Court expressly noted that it was considering the plea of guilty to that charge, as an "admission," not the fact that Hudson had been convicted by the district court. (Tr. 1/9/01 at 86, 151.)

the police arrived at the parents' home, Hudson was very intoxicated. (Tr. 1/9/01 at 77-78.)

Given the totality of all of these circumstances, the officers had probable cause to believe that Hudson had arrived at his parents' home in a state of intoxication. Thus, the officers had probable cause to believe that Hudson had committed the offense of being drunk in public. In fact, Hudson was intoxicated when he arrived at his parent's home. Hudson's brother, Steven Hudson, testified at trial that he saw Hudson in the driveway and took him inside to try to "sober him up." (Tr. 1172-73.) Hudson's statement acknowledged that he was drinking that evening at his home. (Tr. 1058.) The officers' failure to observe Hudson's intoxication "in public," prior to arresting him, may constitute a violation of Virginia Code § 19.2-81, but it did not strip the officers of probable cause to arrest him. Significantly, such a statutory violation does not constitute grounds for suppression of evidence. *See Penn v. Commonwealth*, 13 Va. App. 399, 412 S.E.2d 189 (1991), aff'd, 244 Va. 218, 420 S.E.2d 713 (1992) (*per curiam*). *See also Thompson v. Commonwealth*, 10 Va. App. 117, 123, 390 S.E.2d 198, 202 (1990) (where officer had probable cause to arrest defendant and no deprivation of constitutional rights occurred, any violation of Va. Code § 19.2-81 did not warrant exclusion of defendant's voluntary confession). Because the officers had probable cause to arrest Hudson for being drunk in public, any violation of Va. Code § 19.2-81 did not require exclusion of evidence or statements obtained as a result of the arrest.

The police also had probable cause to arrest Hudson for the homicide of his wife. The fact that they did not subjectively rely on that ground for arrest is of no consequence. "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Limonja v. Commonwealth*, 8 Va. App. 532, 538, 383 S.E.2d 476, 480 (1989) (en banc) (citations omitted). The reviewing court must look at all the objective facts. In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court found as follows: "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 813 (citation omitted). *See Devenpeck v. Alford*, 543 U.S. ---, 125 S. Ct. 588 (2004).

In this case, the officers had probable cause to arrest Hudson for the homicide of Mary Donovan. Deputy Jones knew that Hudson had reported to his father that Donovan had shot herself. (Tr. 1/9/01 at 82.) However, upon

arriving at the home Donovan and Hudson shared, Jones found evidence that was not consistent with suicide, but which was indicative of violence and homicide. (Tr. 662.) There was broken glass on the kitchen floor. (Tr. 1/9/01 at 67; Tr. 642, 662.) The body of the victim was lying on the couch in the living room. The gun lay awkwardly in the victim's hand. Although Donovan's face was bloody, no blood appeared on her hands. (Tr. 648.) Yet, Jones saw a bloody hand print on the back of the couch. (Tr. 1/9/01 at 69.) Finally, although Hudson had reported the shooting to his father, thus indicating that he was at the home when the shooting occurred, he fled from the home before the police arrived. (Tr. 1/9/01 at 68, 75.)

This "totality of circumstances" justified the police in arresting Hudson for homicide. Although the police did not state that they were arresting Hudson for the homicide of his wife, the officers objectively had probable cause to do so. Thus, even if the officers erred in arresting Hudson for being drunk in public, they had probable cause to arrest him for the killing, and the evidence and statement obtained as a result of the arrest were not subject to suppression.[5]

In his Court of Appeals brief, Hudson relied on *Knowles v. Iowa*, 525 U.S. 113 (1998), and *Rhodes v. Commonwealth*, 29 Va. App. 641, 513 S.E.2d 904 (1999) (en banc), to argue that the trial court should have suppressed the results of the gunshot residue test administered to Hudson after he was arrested and brought to the sheriff's department. Unlike the Defendants in *Knowles* and *Rhodes*, Hudson was arrested. While a summons was issued, an arrest warrant was subsequently issued. (Tr. 1/9/01 at 103.)[6] The defendant was extremely intoxicated. His father had requested that he be removed from the father's home. Hudson's own home was the scene of a police investigation into his wife's shooting death. The officers could not release Hudson. Deputy Small testified that Hudson was taken into custody "for his safety." (Tr. 810.) Thus, he was properly arrested. Virginia Code § 19.2-74(A)(2) specifically excludes from its coverage the offense of public drunkenness. Because of their

---

[5] Hudson's clothing was seized as result of a subsequently issued search warrant. (Tr. 1/9/01 at 121.) The statement obtained the night of the arrest was quite similar to a subsequent statement given by Hudson, in the presence of his attorney. (Tr. 1/9/01 at 121; Tr. 1025-27, 1055-61.)

[6] The arrest warrant was not made part of the record. When the Commonwealth attempted to introduce it into evidence, Hudson objected on the ground that it contained extraneous information about his conviction in the district court. The Court sustained the objection. (Tr. 1/9/01 at 104.)

boisterous nature, the police are permitted to make custodial arrests of intoxicated persons, and when doing so, they may search or question those persons incident to that arrest.

Furthermore, as argued above, the police had probable cause to arrest Hudson for homicide. Consequently, they had probable cause to conduct the gunshot residue test on Hudson's hands. The police also faced exigent circumstances with regard to such a test. Residue evidence is fragile and can be washed off or rubbed off. (Tr. 1/9/01 at 74-77, 117.) The record reveals that it was raining on the night of September 20, 1999. (Tr. 1068, 1222.) Furthermore, Deputy Roper testified that a magistrate was not always on duty and a delay could have been fatal to the ability to conduct a valid test for residue. (Tr. 1/9/01 at 117-18.)

Probable cause and exigency combined to justify the gunshot residue test. *See Wright v. Commonwealth*, 222 Va. 188, 193, 278 S.E.2d 849, 853 (1981) ("Where there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation."). *See generally Verez v. Commonwealth*, 230 Va. 405, 337 S.E.2d 749 (1985). The trial court did not err in denying the motion to suppress.[7] Thus, even had the issue been decided on appeal, there is no reasonable probability that Hudson would have obtained relief on that basis.

## 2. Objection to DNA Evidence

Hudson also contended before the Court of Appeals that the trial court abused its discretion in overruling his objection to the admission of DNA evidence, due to the Commonwealth's tardiness in providing certain DNA reports.[8] He claimed on appeal that the Court's refusal to bar the admission of

---

[7] The value of the gunshot residue test was that it demonstrated that Hudson had touched a firearm, contrary to his claim that he had not handled a gun in two days. Of course, Hudson relied on the actual results of the gunshot residue test because the elements present on his hands were not completely consistent with the elements present in the ammunition which killed the victim.

[8] On appeal, Hudson limited his challenge to the admission of DNA evidence to the report filed on December 29, 2000. An additional report, concerning DNA analysis of the victim's twin brother, was filed on January 9, 2001. The trial court limited the Commonwealth's introduction of the results of the January 9th report to rebuttal evidence in the event the defense challenged the forensic scientist's statistics based on

the evidence violated due process. The Court, however, did not err, but properly exercised the discretion provided to it by Va. Code § 19.2-270.5,[9] which provides in pertinent part as follows:

> At least twenty-one days prior to commencement of the proceeding in which the results of a DNA analysis will be offered as evidence, the party intending to offer the evidence shall notify the opposing party, in writing, of the intent to offer the analysis and shall provide or make available copies of the profiles and the report or statement to be introduced. In the event that such notice is not given, and the person proffers such evidence, the court may in its discretion either allow the opposing party a continuance or, under appropriate circumstances, bar the person from presenting such evidence. The period of any such continuance shall not be counted for speedy trial purposes under § 19.2-243.

In *Caprio v. Commonwealth*, 254 Va. 507, 493 S.E.2d 371 (1997), the Supreme Court of Virginia held that, where there is an untimely disclosure of DNA evidence, the clear language of Code § 19.2-270.5 limits a trial court's discretion "to a choice of 'either' of two defined options." *Id*. at 512, 493 S.E.2d at 374. The Court in *Caprio* determined that, if the trial court determines that the evidence is admissible, "the statute requires the court to grant a motion to interrupt and postpone the progress of the trial to afford the

---

the fact that the victim had a twin brother. (Tr. 183.) The report from January 9, 2001, was not introduced at trial.

[9] Hudson filed a written objection in the trial court to the admission of the DNA evidence which was the subject of the report provided to him on December 29, 2000. The written motion did not rely on constitutional arguments. The Court held a hearing on the motion on January 3, 2001. (The Court heard argument regarding an additional DNA certificate on January 10, 2001.) Hudson challenged the constitutionality of the provision in Va. Code § 19.2-270.5 that states that any continuance granted because a party was late in providing DNA reports shall not be counted for speedy trial purposes under Va. Code § 19.2-243. (Tr. 1/3/01 at 37, 45, 47.) A party must raise the specific allegation at trial that he wishes to pursue on appeal. See *Buck v. Commonwealth*, 247 Va. 449, 452-53, 443 S.E.2d 414, 416 (1994); Rule 5A:18. An objection that a portion of a statute violates due process is not the same as an objection that the court's ruling on an objection violated due process. Thus, any due process argument raised in the Court of Appeals would be barred by Rule 5A:18.

defense a period of time for consultation with other experts and preparation of an appropriate response to the new evidence." *Id.*

In this case, at the hearing on Hudson's motion, the trial court asked Hudson if he wanted a continuance in the event the Court did not find appropriate circumstances to bar admission of the evidence. Hudson said he did not and argued that he should not have to ask for a continuance because he was not at fault. (Tr. 1/3/01 at 36.) The Court then stated that it did not find the circumstances appropriate to bar admission of the evidence. (Tr. 1/3/01 at 44.) The Court advised Hudson again that he was allowed a continuance. Hudson declined the continuance. (Tr. 1/3/01 at 45.)

In light of the laboratory's inability to complete the analysis in a timely manner, the fact that the scientist had met with Hudson's counsel, and the prosecutor represented that the scientist would be available to meet with him again, the Court did not abuse its discretion in finding that the circumstances did not warrant a bar to the admission of the evidence. Having ruled that it would not bar the admission of the evidence, the Court complied with the statute and afforded Hudson a continuance. Hudson declined the continuance. The Court did not err. Significantly, the critical DNA testimony at trial concerned blood on Hudson's shirtsleeve. Those findings were included in an earlier report from September 1, 2000. There is not a reasonable probability of reversal on this ground, had this issue been decided by the appellate courts.

The principles governing the review of trial counsel's performance were restated by the Supreme Court of the United States in *Burger v. Kemp*, 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114 (1991):

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a Court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac*, 456 U.S. 107, 133-134, 71 L. Ed. 2d 783, 102 S. Ct. 1558 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting affects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

The *Burger* Court went on to note at 483 U.S. at 657:

[I]n considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Chronic*, 466 U.S. 648, 655, n. 38, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). We have decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d 674, 105 S. Ct. 2052.

It would appear that there were reasonable grounds for the strategic judgment of the Petitioner's trial counsel in not pursuing a continuance which, if done, would have obviated the Petitioner's objection to the timeliness of the DNA report about which he now complains.

### 3. Failure to Grant Suicide Instruction

Hudson claims that the suicide instruction was supported by the evidence and was a proper statement of the law and that, without the proffered instruction, the jury received incomplete guidance for their deliberations. While this instruction was a proper statement of the law and perhaps could have been given, the trial court did not err in refusing the proffered instruction. In instructing the jury, the trial judge is responsible for seeing that "the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Darnell v. Commonwealth*, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (citation omitted). "If the principles set forth in a proposed instruction are fully and fairly covered in other instructions that have been granted, a trial court does not abuse its discretion in refusing to grant a repetitious instruction." *Joseph v. Commonwealth*, 249 Va. 78, 90, 452 S.E.2d 862, 870 (1995). *See Hubbard v. Commonwealth*, 243 Va. 1, 16, 413 S.E.2d 875, 883 (1992).

The instruction at issue concerned accident and suicide and read as follows:

Where the defense is that the killing was an accident or suicide, the defendant is not required to prove this fact. The burden is on the Commonwealth to prove beyond a reasonable doubt that the killing was not accidental or by suicide. If after considering all the evidence you have a reasonable doubt whether the killing was accidental or suicidal or intentional, then you shall find the defendant not guilty.

(Exhibit 11.)

The proposed instruction was modified from Model Jury Instruction 33.850, which addresses accident only. While the model does not expressly address suicide, the principle does apply to suicide as well as to an accidental death.

The Commonwealth was required to prove that the defendant killed the victim. It was not required to prove that the victim did not commit suicide. *See State v. Babb*, 877 P.2d 905, 912 (Idaho 1994). The trial court recognized that the jury already was instructed "with regard to burden of proof." (Tr. 1281.) Indeed, in Instruction 2, the jury was instructed that the presumption of innocence remains with the defendant throughout the trial and is enough to require acquittal "unless and until the Commonwealth proves each and every element of the offense beyond a reasonable doubt." (Exhibit 13.) That instruction stated that there was no burden on the defendant to produce any evidence. Instruction 3 recited the elements that the Commonwealth was required to prove. The first numbered element was, "That the defendant killed Mary Donovan Hudson." (Exhibit 14.) Instruction 4 directed the jury to resolve any doubt as to the grade of the offense in favor of the defendant. (Exhibit 15.)

These instructions advised the jury that the Commonwealth was required to prove criminal agency. Furthermore, when coupled with counsel's argument, the granted instructions leave no doubt that the jury understood that it was the Commonwealth's burden to prove that the defendant was the one who shot his wife. *See Buchanan v. Angelone*, 522 U.S. 269, 278-79 (1998) (in entire context in which instructions given, including testimony and argument of counsel, no reasonable likelihood that jurors misunderstood instructions).[10] Under these circumstances, the trail court's refusal of this instruction did not prejudice the petitioner.

### E. Procedural Default

In Allegation B, the petitioner alleges that he was denied his due process rights and his right to fundamental fairness when he was denied his constitutional right to have all of his appellate issues decided, except one. That claim, however, is not cognizable in a habeas corpus action in this Court. "A prisoner is not entitled to use habeas corpus to circumvent the trial and

---

[10] Defense counsel argued extensively that the victim committed suicide. (Tr. 1308, 1314, 1338-1350.) The Commonwealth addressed suicide in its closing argument. (Tr. 1302.)

appellate processes for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction." *Slayton v. Parrigan*, 215 Va. 27, 30, 205 S.E.2d 680, 682 (1974). "[A] claim that could have been raised at the criminal trial or on direct appeal is not cognizable in habeas corpus because to do so would circumvent the trial and appellate process for non-jurisdictional defects." *Henry v. Warden, Riverside Regional Jail*, 265 Va. 246, 248, 576 S.E.2d 495, 496 (2003). Furthermore, "a non-jurisdictional issue raised and decided either in the trial or on direct appeal from the criminal conviction will not be considered in a habeas corpus proceeding." *Henry*, 265 Va. at 249, 576 S.E.2d at 496.

In the petition for rehearing filed in the Virginia Supreme Court, Hudson argued that neither the Code of Virginia nor the Virginia Constitution required the Supreme Court to enter final judgment. (Exhibit 4, at p. 2.) He argued that under Article VI, § 6, of the Virginia Constitution, the Virginia Supreme Court had discretion to enter final judgment as well as to remand a case for further proceedings. He argued that, because issues remained unresolved, "substantial justice has not been reached in this matter and the cases must be remanded for further proceedings in the interest of fairness." (Exhibit 4, at p. 6.)

The petitioner did not argue his current constitutional claims in his petition for rehearing. He now contends in habeas corpus that the failure of the Court of Appeals to decide all of the issues it had granted and the Supreme Court's failure to remand those issues to the Court of Appeals for a decision violated the state and federal constitutions. He cites the 5th, 6th, and 14th amendments to the United States Constitution and Article I, § 8, of the Virginia Constitution. However, he did not rely on these provisions in the petition for rehearing. He argued that the only way to "ensure proper appellate review" and "achieve substantial justice" in the case, was to remand the matter to the Court of Appeals for determination of the "unresolved issues." (Exhibit 4, at p. 5.) He did not argue his current constitutional claims and the issue is barred pursuant to the rule in *Slayton v. Parrigan, supra*.

In the very last sentence of the argument in the petition for rehearing, Hudson argued that the issues must be resolved by the appellate courts to ensure that he received "a fair trial on the merits, that the ends of justice and fairness are achieved, and the Defendant receives full and complete due process of law." Even if the trial court were to find that, by this sentence, Hudson presented his current habeas Claim B on direct appeal, the claim would be barred pursuant to the rule in *Henry v. Warden, supra*.

*III. Decision*

For the foregoing reasons, it is adjudged and ordered that (1) Petitioner's Motion for an evidentiary hearing is denied and (2) the Petition for Habeas Corpus is dismissed with prejudice.

The Clerk shall forward copies of this order to the Petitioner, Respondent's counsel, and to the Commonwealth's Attorney of Clarke County. Counsel of record shall file such objections hereto as deemed advisable within ten days of their receipt of a copy of this order. Endorsement is dispensed with pursuant to Supreme Court Rule 1:13.

This is a final order, and the Clerk is directed to place this case in the ended files. Any notice of appeal of this order to the Supreme Court of Virginia must be filed with the Clerk of this Court within thirty days of the entry of this order.